**BOBIER, d. b. a. FEDERAL APPLIANCE SERVICE, Plaintiff v NATIONAL CASUALTY CO., et, Defendants.**

Municipal Court. Cleveland (city)

No. A-3217. Decided December 16, 1942.

Harry Blachman, Cleveland, for plaintiff.

Flynn & Benesh, Cleveland, for National Casualty Co.

McKeehan, Merrick, Arter & Stewart, Cleveland, for Columbia Casualty Co.

## OPINION

By JACKSON, J.

This is an action based on contracts of insurance and was commenced by the filing of a petition by the plaintiff, Jack Bobier, doing business as Federal Appliance Service Co., naming the National Casualty Company and the Columbia Casualty Company as defendants.

To this petition the defendants filed separate answers denying liability.

Before trial, by agreement of counsel for both defendants, plaintiff was given leave to file a supplemental petition containing a third, fourth, fifth and sixth causes of action. It was further agreed that the same denials made to the petition should apply to the supplemental petition. During the course of the trial plaintiff was permitted to dismiss without prejudice as to the fourth, fifth and sixth causes of action.

The plaintiff herein was engaged, among other things, in installing stoves and in connection therewith picked up stoves and transported them by automobile, delivered and installed them. For his protection he took out two forms of insurance, the first with one of the defendants, the National Casualty Co., called a National Standard Automobile Liability Policy: and the other with the other defendant, the Columbia Casualty Co., called a Manufacturers' and Contractors' Liability Policy, both of which are admitted to have been in effect during the periods alleged in the petition and supplemental petition.

The evidence showed that on or about August 29, 1941 plaintiff assured's employees went by automobile to the furniture store of one Seigelman and Roth Co., 5379 Broadway, Cleveland, Ohio to pick up a stove, that they went to the rear of the store, picked up the stove and carried it without depositing it until they finally put it into the automobile of the plaintiff. In the process of carrying the stove out they negligently damaged a davenport belonging to Seigelman and Roth Co. which was standing towards the rear of the store. The reasonable cost of repairing the davenport was $20.00 (twenty dollars) and when both of the defendants disclaimed any liability therefor plaintiff paid the said $20.00 and brought this ac-

tion to recover as set forth in his first and second causes of action.

The evidence also showed that on or about September 25, 1941 plaintiff assured's employees had transported a stove by automobile for delivery to one Mr. Luxton at 10502 Prince Avenue, Cleveland, Ohio. While carrying the stove from the automobile, without depositing it, they negligently damaged the hall of the premises of Mr. Luxton. The reasonable cost of repairing said damage was $24.50 (twenty-four dollars and fifty cents), which plaintiff paid to avoid suit since both defendants herein denied any liability.

The principal question to be determined relates to  what  is meant by the phrase "loading and unloading", as found in the policies above referred to. The pertinent provisions of the National Casualty Co. policy are as follows:

"1. Coverage B—PROPERTY DAMAGE LIABILITY. To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the **ownership, maintenance or use of the automobile**".

### Conditions

"2. Purposes of Use Defined. (a) The term "pleasure and business is defined as personal, pleasure, family and business use. (b) the term "commercial" is defined as the transportation or delivery of goods, merchandise or other materials, and uses incidental thereto, in direct connection with the named insured's business occupation as expressed in Item 1. (c) **Use of the automobile for the purposes stated includes the loading and unloading thereof**".

The pertinent provisions of the Columbia Casualty Co. policy are as follows:

"Coverage B—Property Damage Liability. To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the hazards hereinafter defined".

"Definition of Hazards—Division 1. Premises—Operations. The ownership, maintenance or use of the premises, and all operations during the policy period which are necessary or incidental thereto".

"Exclusions—This policy does not apply:  (a) under division 1 of the Definition of Hazards, to dogs, draft or saddle animals, water craft, **vehicles of any kind** (other than hand trucks, push carts and bicycles), or the **loading or unloading thereof**, while away

from the premises, unless such hazards are specifically declared and described in this policy and premium charged therefor;"

Plaintiff asks this court to determine the respective liabilities of the defendants. If the plaintiff assured's employees were engaged in loading and unloading at the time of the acts set forth in the plaintiff's petition and supplemental petition, then the policy of the National Casualty Co. is applicable; otherwise, the policy of the Columbia Casualty Co. is involved.

The verb "load" has been defined in Webster's New International Dictionary, second edition, as follows: "1—to lay a load or burden in or on as on a horse or in a cart; 2—to place on or in something as for carriage as to load a cargo of flour; to load hay". The verb "unload" is therein defined as "to take the load from".

An examination of most of the cases cited by counsel as well as others discloses that the courts are by no means in agreement as to what is meant by "loading and unloading".

One view seems to be that the process of "unloading" continues until final deposit of the goods where they were to be delivered by the assured. The leading case supporting this contention is one decided by the Supreme Court of Montana March 11, 1940 State ex rel Butte Brewing Co. et al v District Court of Second Judicial District in and for Silver Bow County et al. 100 Pacific 932.

It appeared in that case that one Richard McCulloh was injured on May 3, 1938 as follows: The brewing company was engaged in delivering a barrel of beer to a place known as "Clifford's" at 11 E. Broadway in the city of Butte. The beer was about to be delivered into the basement through certain hinged doors in the sidewalk. On the day in question the beer had been taken from the brewing company's truck and placed upon the sidewalk. As plaintiff was walking along the sidewalk one of the servants of the brewing company, without warning to McCulloh, lifted the door from underneath the sidewalk preparatory to lowering the beer into the cellar through the door. The door was lifted just as McCulloh stepped on it and as a result he was injured.

The brewing company held two policies of insurance. One issued by the insurance company and the other by an indemnity company, the former being dated January 10, 1938 and the latter January 19, 1938.

The insurance company contract obligated it for injuries arising out of the ownership, maintenance, or use of the automobile, specifically described in the policy. The policy further provided that the automobile was to be used for commercial purposes and contained this provision:

"(b) the term "commercial" is defined as the transportation or delivery of goods, merchandise, or other materials, and uses incidental thereto, in direct connection with the named insured's business occupation as expressed in item 11 of the Declarations".

The policy also specifically provided that "use of the automobile for the purposes stated includes the loading and unloading thereof". The truck in question was covered by the policy. The indemnity policy excluded use of the automobile and loading and unloading elsewhere than with or upon the premises of the assured.

The court held:

"Under the facts here presented the unloading of the truck was a continuous operation from the time the truck came to the stop and transportation ceased until the barrel of beer was delivered to the customer. The unloading of the truck cannot be said to have been accomplished when the barrel was placed upon the sidewalk. As well might be argued that the loading of the truck consisted merely of the act of lifting commodities from the ground to the body of the truck. The loading of the truck should contemplate much more than that. It would embrace the entire process of moving the commodities from their accustomed place of storage or the place from which they were being delivered until they had been placed on the truck. So, too, the unloading thereof embraced the continuous act of placing the commodities where they were intended to be actually delivered by use of the truck".

Of the opposite view is the opinion of the court in Stammer v Kitzmiller et al (Supreme Court of Wisconsin December 7. 1937), 276 Northwestern 629. Facts of this case were that an employee of a brewing company was, on January 16, 1935, using a truck to deliver beer to a tavern. The employee parked the truck at the curb, got out, opened a hatchway on the sidewalk, then removed the barrel of beer from the truck and placed it on the sidewalk or pavement. He then lifted the barrel and put it through the hatchway into the basement of the tavern. While he was engaged in having the sales slip signed inside the tavern the plaintiff fell into the unguarded open hatchway. The court speaking through Justice Fairchild said:

"We pass to the question of coverage afforded by the stipulations in the employee's mutual insurance policy which reads: 'Operation, maintenance or use (including transportation of goods, loading or unloading) of an automobile'. The stipulation to pay all losses and expenses embodied by law under the clause quoted does not carry the liability of the insurer beyond what may be described as the natural territorial limits of an automobile and the process of loading and unloading it. When the goods have been taken off the automobile and have actually come to rest, when the automobile itself is no longer connected with the process of unloading, and when the material which has been unloaded from the auto has plainly started on its course to be delivered by other power and forces independent of the automobile and the actual method of unloading, the automobile then may be said to be no longer

in use. The precise line at which the unloading of the automobile ends and a further phase of commerce such as the completion of delivery begins after unloading may in some cases be difficult of ascertainment, but where, as here, the merchandise had been removed from the truck and considerable time had elapsed after anything was done which could reasonably be said to be connected with the actual unloading there is no difficulty in limiting the responsibility of the insurer who covers loading and unloading operations, and fixing the liability of the insurer who protects against loss arising from the acts caused by employees of the assured engaged in the discharge of their duties to carry on its work of the assured's premises. While the open hatchway may have been a convenience in the process of further delivery of the goods it was not under the facts with which we are dealing included in the process of unloading the truck".

If we should adopt the rule laid down by the Supreme Court of Montana supra it has been pointed out by counsel for the National Casualty Company that it would lead to some odd results in some types of cases. Take for example the case of a milkman who removes bottles of milk from his milk wagon or truck and then proceeds to deliver them to his various customers on various floors of an office building. If the unloading continues until delivery is made the unloading would continue onto various floors throughout the building and if he committed an act of negligence on one of these floors the automobile policy would apply. To avoid such a situation the Supreme Court of Minnesota in 1937 in the case of Franklin Cooperative Creamery Association v Employers Liability Assurance Corp. et al. 273 Northwestern 809 held that such an employee "had started on his rounds to peddle milk to his various customers. After he left his wagon carrying his containers the process of retail distribution commenced. If he had served customers on the first floor prior to his attempt to take the elevator it could hardly be contended that he was still engaged in unloading the vehicle. Nor could it be so contended if some acts had happened while he was passing from customer to customer". Of similar import was the decision of the Supreme Court of New Jersey on May 28, 1937 in the case of Zurich General Accident Liability Insurance Co. Ltd. v American Mutual Liability Insurance Co. of Boston 192 Atlantic 387. In that case assured's employee delivered milk and ice and while putting the ice in the icebox a third party was injured with the ice pick sticking out of the pocket of the employee. Court held that the employee was engaged in servicing not contemplated by loading.

The precise question involved here has never been decided in our Ohio Courts so far as we have been able to determine. The only Ohio case cited is **Luchte v State Automobile Mutual Insurance Co. 50 Oh Ap 5.** That was a case in which the policy of the

assured contained the following provision: "The Association does hereby insure the assured against liability and loss and all expenses resulting from claims upon the assured for damages caused while this policy is in force by the use, ownership, maintenance or operation of the motor vehicle described in statement 4 of Schedule of Warranties".

The assured used one of his trucks for delivering coal. His driver dumped the coal in the street in front of the customer's house, drove away a short distance, turned, and was returning to his place of business from the delivery. He dumped the coal in the early morning before clear daylight and failed to leave a light or any other warning on the pile of coal. A man by the name of Bell driving a motorcycle ran into the pile of coal and received injuries from which he died. The question before the court was primarily whether the insurance company was liable for expenses in defending the suit of the administrator of Bell against Luchte by reason of a clause in the insurance policy in which the insurance company agreed, among other things, to defend a suit for damages against the assured arising out of accidents covered in the insurance policy. The petition of the administrator of Bell did not contain an allegation to the  effect that the negligence and injuries arose out of the use. ownership, maintenance or operation of the motor vehicle. The court found that the negligence complained of was the dumping of the pile of coal in front of the premises and leaving the same without the warning of lights and said, "we are unable to see any connection between the alleged negligent acts on the coverage of the policy and the insurance company was not bound under that contract to defend the suit". The court went on to review a case cited by counsel entitled Panhandle Steel Products v Fidelity Union Casualty Co. 23 Southwestern second 799 in which the facts were that a party was injured as a result of the negligent manner in which a beam was unloaded and the court in the Ohio case distinguishes from the Panhandle case supra in that in the Ohio case the coal had been dumped and the truck had left the scene.

Without reviewing each case cited by counsel specifically the court comes to the inescapable conclusion that there is in reality no ambiguity in the use of the words "loading and unloading" and that they have been inserted in insurane policies having regard to the ordinary meaning given to such words. These words have been inserted in policies to clarify or to define the "use" of an automobile. They were never intended to include the whole process of pick-up and delivery even though those duties may be contemplated by the business of the assured.

The question arises as to what sort of rule can be laid down which if applied to cases like the present will enable the court to reasonably determine whether the liability is that of the general insurer or that of the automobile insurer

The court believes that by "loading and unloading" in such policies is meant those acts so near to or directly connected with

the use of the automobile that the presence of the automobile is necessary to the carrying out of the process of "loading or unloading". For example, in the case of loading it is not necessary for the automobile to be at the place of loading until the object which is to be loaded in or upon the automobile is in the process of being put in or upon the automobile. In the case of unloading, if, after the goods have been removed from the automobile the automobile should be driven off while the goods were still being carried into a business, it certainly could not be said that they were still in the process of unloading the automobile which, by the time the persons carrying the load into the building had reached a stairway, may have been hundreds of yards away.

Even the adoption of the rule outlined above does not make it clear as to the exact point at which "loading or unloading" begins or ends and each case will have to be decided on the basis of its own facts. It would seem that the insurance companies should take steps to change the wording in their policies so as to make it absolutely clear as to under what circumstances a general insurance policy will be applicable.

Applying the rule of law outlined above to the instant case the court finds as a matter of fact that while the act of the assured's employee in going to the rear of the store of Seigelman and Roth. as set forth in plaintiff's petition was an act pursuant to the performance of the business of the assured they were not engaged in "loading" the stove onto the automobile of the assured at the time of the act which damaged the davenport and not until they reached a point so near to and adjacent to the automobile that the automobile was necessary to complete the act. The court further finds that at the time the davenport was damaged plaintiff's employees were engaged in the carrying on the business of the plaintiff as covered by the policy of defendant Columbia Casualty Co. The court therefore finds for the defendant National Casualty Co. on plaintiff's petition and for plaintiff in the sum of $20.00 against Columbia Casualty Co. on the second cause of action.

Applying this same rule to the act of the plaintiff's employees in carrying up a stove to the premises of the customer, Mr. Luxton, and damaging the hall of said premises they were not at that time engaged in "unloading". The "unloading" had ceased but the plaintiff's employees were at the time engaged in the business of plaintiff as covered by the policy of the Columbia Casualty Co.

The court therefore finds for the plaintiff in the sum of $24.50 in the third cause of action as against the Columbia Casualty Co. and in the same cause of action for the defendant National Casualty Co.